Lauren X. Topelsohn, Esq.
Steven I. Adler, Esq.
**MANDELBAUM SALSBURG, P.C.**
**3 Becker Farm Road, Suite 105**
**Roseland, New Jersey 07068**
**T. 973-736-4600**
**F. 973-325-7467**
**Attorneys for Plaintiff**

| | |
|---|---|
| **VITA-PURE, INC., DELTA LABORATORIES INC., VNH, LLC, and BEST NUTRITIONALS, LLC,**<br><br>      **PLAINTIFFS,**<br><br>      **V.**<br><br>**SAMIR BHATIA, APARNA BHATIA a/k/a APARNA PATIL, PRIANKA BHATIA, RAVINDER BHATIA, HNB CONCEPTS, LLC, H&B CONCEPTS, GOOD BRANDS, LLC, HEALTH CONCEPTS, LLC, JAGDAMBE INDUSTRIES and  JOHN DOES 1-10 and XYZ Corp. 1-10,**<br><br>      **DEFENDANTS.** | **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY CIVIL ACTION NO.  _____**<br><br><br><br>**COMPLAINT AND JURY DEMAND** |

Plaintiffs Vita-Pure, Inc., Delta Laboratories Inc., VNH, LLC and Best Nutritionals, LLC (collectively, "**Plaintiffs**" or the "**Companies**"), by way of  their Complaint against defendants Samir Bhatia, Aparna Bhatia a/k/a Aparna Patil, Prianka Bhatia, Ravinder Bhatia, HNB Concepts, LLC, Good Brands, LLC, Health Concepts, LLC, Jagdambe Industries, John Does 1 through 10, and XYZ Corps. 1 through10 (collectively "**Defendants**"), say and allege as follows:

## NATURE OF THE ACTION

1.      The crux of this action is a continuing, massive fraud with international implications and multiple co-conspirators that was masterminded by defendant Samir Bhatia ("**Bhatia**"), a former employee of plaintiff Vita-Pure, Inc. ("**Vita-Pure**") (hereafter the "**Fraudulent Scheme**"). Sometime after Vita-Pure hired Bhatia and entrusted him with the

656434

responsibility of developing and operating the Companies' e-commerce businesses, Bhatia and his wife, defendant Aparna Bhatia a/k/a Aparna Patil ("**Aparna**"), with the remaining defendants, including at least four (4) companies that Bhatia owns and/or controls, conspired to defraud the Companies out of hundreds of thousands of dollars by siphoning revenues from Plaintiffs' e-commerce websites, stealing Plaintiffs' inventory, ultimately out-right high-jacking Plaintiffs' sites and, in the interim, developing multiple e-commerce businesses in direct competition with Plaintiffs which Defendants continue to operate to date (collectively, the "**Competitive Sites**"), all in violation of Bhatia's employment agreement (the "**Employment Agreement**").  Defendants unveiled their Fraudulent Scheme for the first time on or about August 21, 2014, after Bhatia's attempt to extort fifty percent (50%) of Plaintiffs' e-commerce businesses from Plaintiffs' owner Achyut Sahasra ("**Sahasra**") failed.  On that date, Bhatia looted Plaintiffs' offices, stole two (2) laptop computers (the "**Stolen Computers**")[1] and Plaintiffs' proprietary information, and hijacked the Companies' websites by, <u>inter alia</u>, disabling all known passwords, and converted hundreds of thousands of dollars in revenues and inventory from the Companies.

      2.        Plaintiffs have expended, and continue to expend, enormous resources in an effort to recover their e-commerce businesses, resume normal operations and determine the scope and the Fraudulent Scheme.  Each day reveals a new facet of that scheme through which Bhatia, with the direct and/or indirect knowledge and assistance of the remaining Defendants, stole at least $1.2 million from the Companies, converted in excess of $1.6 million in inventory, which Defendants are selling on sites stolen from Plaintiffs and/or the Competitive Sites, and/or under

---

[1] Specifically, Bhatia removed (a) an Apple iPad and (b) MacBook Air (serial number (C02LGDPGF5V8), both of which are the property of Plaintiff VNH, LLC.

trademarks that rightfully belong to Plaintiffs.

3.　　　Plaintiffs seek an injunction, damages and related relief.

## JURISDICTION AND VENUE

4.　　　This action arises under the laws of the United States, more specifically 18 U.S.C. §1961 et seq., ("**RICO**"), 18 U.S.C. 1030 et seq. (the "**Computer Fraud and Abuse Act**"), and 18 U.S.C. §§ 2701 et seq. (the "**Federal Stored Communications Act**"), such that this Court has original jurisdiction under 28 U.S.C. §1331.  This Court also has supplemental jurisdiction over the related state law causes of action pursuant to 28 U.S.C. §1367.

5.　　　Venue is appropriate under 28 U.S.C. §1391(b) in that each of the defendants resides or conducts business in this State and/or a substantial part of the events or omissions giving rise to the claims occurred in this District.

## THE PARTIES

6.　　　Plaintiff Vita-Pure, Inc. ("Vita Pure") is a New Jersey limited liability company having its principal place of business located at 410 West 1st Avenue, Roselle, New Jersey 07203.

7.　　　Plaintiff VNH, LLC ("VNH") is a Delaware limited liability corporation having its principal place of business located at 20 Lafayette Place, Kenilworth, NJ 07033.

8.　　　Plaintiff Delta Laboratories Inc. ("Delta") is a New Jersey corporation having its principal place of business located at 410 West 1st Avenue, Roselle, New Jersey 07203.

9.　　　Plaintiff Best Nutritionals, LLC ("Best") is a Delaware limited liability corporation having its principal place of business located at 20 Lafayette Place, Kenilworth, NJ 07033.

10.      Upon information and belief, Bhatia is an individual residing at 135 Montgomery Street, Apartment 20F, Jersey City, New Jersey

11.      Upon information and belief, Aparna is an individual residing at 135 Montgomery Street, Apartment 20F, Jersey City, New Jersey 07302, is the wife of Bhatia, and visited VNH's offices at which time she spoke with Sahasra.

12.      Upon information and belief, Prianka Bhatia ("**Prianka**") is an individual, who resides in Mumbai, Maharashtra, India, and is the sister of Bhatia.

13.      Upon information and belief, Ravinder Bhatia ("**Ravinder**") is an individual, who resides in Mumbai, Maharashtra, India, is the father of Bhatia, the owner, director and/or officer of defendant Jagdambe Industries.

14.      Upon information and belief, defendant HNB Concepts, LLC ("**HNB**") is a New Jersey limited liability company having its principal place of business at 135 Montgomery Street, Apartment 20F, Jersey City, New Jersey 07302, and was formed in and around May 2012.

15.      Upon information and belief, defendant H&B Concepts ("**H&B India**") is an India-based company with offices located at 12A. Ravi Chambers, Canada Corner, Nashik, Maharashtra, India, 422005.

16.      Upon information and belief, defendant Good Brands, LLC ("**Good Brands**") is a Delaware limited liability company having its principal place of business at 135 Montgomery Street, Apartment 20F, Jersey City, New Jersey 07302 and was formed in and around March 2013.

17.      Upon information and belief, defendant Health Concepts, LLC ("**Health**") is a Delaware limited liability company having its principal place of business at 135 Montgomery Street, Apartment 20F, Jersey City, New Jersey 07302, and was formed in and around March

4

2013.

18.     Upon information and belief, at all relevant times Bhatia and/or Aparna owned, operated and otherwise controlled HNB, H&B India, Good Brands and Health.

19.     Upon information and belief, Jagdambe Industries ("**Jagdambe**"), is a company owned and/or controlled by Ravinder, with offices located at A-9/2, MIDC, AMBAD, Nashik, Maharashtra, India 422010.

20.     Defendants John Does 1-10 are fictitious names used to designate certain persons that, upon information and belief, acted in concert with and/or assisted one or more of the above named Defendants and/or who are otherwise liable to Plaintiffs.

21.     Defendants XYZ Corps. 1-10 are fictitious names used to designate certain entities that, upon information and belief, are owned and/or controlled and acted in concert with and/or assisted one or more of the above named Defendants and/or who are otherwise liable to Plaintiffs.

## FACTS COMMON TO ALL COUNTS

**A.     Plaintiffs' Businesses**

22.     The Companies are engaged in the manufacturing and/or marketing and sale of vitamin and dietary supplements, and are all owned, in their entirety by Sahasra.

23.     Vita-Pure is the manufacturing "arm" of the business and produces products under two trademarked brands, Vita Pure and Best Naturals.

24.     Prior to 2010, Vita-Pure products were primarily sold through distributors, wholesalers and mail order houses in bulk quantities.

25.     In and around early 2010, Sahasra decided to expand Vita-Pure's sales

channels by marketing its products on the Internet.

26.     As detailed below, by August 21, 2014, the majority of Vita-Pure sales were accomplished through three (3) websites (the "**Websites**"), (a) ShopBestNaturals.com, (b) VitaNherbs.com, and (c) VitaminsHub.com, and three (3) Amazon "web stores" (the "**Webstores**") (a) GoodHealthStore, (b) VitaminsHub@Amazon, which was directed to customers in the United States ("**VitaminsHub-US**"), and (c) VitaminsHub-CA, which was directed to customers in Canada ("**VitaminsHub-CA**").  (Collectively, the Websites and Webstores are referred as the "**E-Commerce Sites**").

27.     VNH was formed in June 2010 for the purpose of centralizing the Companies' e-commerce businesses.  Following its formation, VNH paid for all operational costs associated with the E-Commerce Sites, including but not limited to labor, shipping, advertising, website development, and the inventory sold through those sites, including both Vita-Pure products and third-party products purchased for resale.

28.     At all times the Companies used third party processors, including but not limited to, credit card companies, Paypal, Inc. ("**Paypal**"), Google Payment Corp. ("**Google Pay**"), and Amazon Payments, Inc. ("**Amazon Simple Pay**") , to process payments for purchases made through the E-Commerce Sites (hereafter, "**3rd Party Processors**").

**B.     Bhatia's Employment**

29.     On or about July 27, 2009, Vita-Pure hired Bhatia on a part-time basis to assist with marketing.

30.     In and around May 2011, in furtherance of Vita-Pure's e-commerce initiative, Vita-Pure promoted Bhatia to the position of Marketing Manager, hired him on a full-time basis to manage Plaintiffs' e-commerce businesses, and agreed to sponsor and pay for the costs of his

application for a green card.

31.     Throughout the course of his employment, Bhatia was exclusively responsible for the registration of Companies' domains names, overseeing the development and enhancement of the Websites through independent contractors, registration of the Webstores with Amazon Services LLC ("**Amazon**"), establishing accounts with 3rd Party Processors on behalf of the Companies, purchasing Internet keywords and other domain names that are used to direct Internet users to the E-Commerce Sites ("**Keywords**"), and establishing an e-mail "master" account on behalf of Plaintiffs and "sub" accounts to be used by Plaintiffs' employees. (Hereafter, Plaintiffs master e-mail account and all sub-accounts are referred to as the "**E-mail System**").

32.     Throughout his employment, Bhatia was the sole administrator of the E-Commerce Sites and the E-mail System, and he alone knew all administrative passwords, including those passwords needed to access the registration information for the domain names, the administrative level functions of E-Commerce Sites and the 3rd Party Processors' accounts.

33.     Bhatia also was also solely responsible for overseeing inventory replenishment shipments to the Amazon warehouses maintained on behalf of the Webstores and had unlimited access to Plaintiffs' warehouses.

34.     Bhatia was also authorized to use VNH's credit card as necessary to operate the E-Commerce Sites and expand and develop Plaintiffs' e-commerce businesses.

35.     Thus, as a result of his employment, Bhatia was entrusted with and had access to the Companies' confidential and proprietary information including, without limitation, administrative passwords, the log-in credential of Plaintiffs' other employees, customer lists, pricing lists, supplier lists and costs, Keywords, trade secrets, bank information, finances,

research development, manufacturing processes, and 3rd Party Processor information

(collectively "**Proprietary Information**").

     36.       On or about September 20, 2012, Bhatia executed a written Employment

Agreement which provides, in pertinent part as follows:

> Mr. Bhatia is gainfully employed by Vita-Pure/VNH LLC as a Marketing manager for business development of dietary supplements, personal health care product through wholesaler, Retailers and E commerce [sic].

> Mr. Bhatia is fully responsible for all business developments and its [sic] management. Mr. Bhatia is privileged to all sensitive and confidential information about the employer and its business during his employment. Mr. Bhatia agrees not to disclose such information to any party, use the information for personal gain or to compete directly or indirectly with the employer for the period of three years upon termination of his employment for any reason.

> If the employee breaches this agreement in any manner, the employer will be entitled for full compensations [sic] as allowed by law in the state of New Jersey.

     37.       At the time Bhatia signed the Employment Agreement, he understood its

terms and conditions and that in signing it he agreed to be bound by same.

     38.       Throughout the course of Bhatia's employment, Sahasra, was fully immersed

in the manufacturing aspects of Vita-Pure's business, relied on Bhatia to operate the e-commerce

businesses, and trusted him implicitly.

## THE FRAUDULENT SCHEME

     39.       Upon information and belief, within months of the commencement of Vita-

Pure e-commerce initiative in and around March 2010, Bhatia, Aparna, Bhatia's sister, Prianka,

and Bhatia's father, Ravinder, individually and on behalf of Jagdambe Industries, conspired

together and entered into an oral agreement, which was unknown Plaintiffs, wherein they agreed

to siphon monies from the E-Commerce Sites and to use Plaintiffs' monies, Proprietary

Information and inventory to establish and operate their own e-commerce businesses in direct competition with Plaintiffs and in furtherance of the Fraudulent Scheme.

40.     Upon information and belief, in furtherance of the Fraudulent Scheme, Bhatia, Aparna, Prianka, and Ravinder agreed that (a) Bhatia and/or Prianka would directly, or through VNH's free-lance web designers, create links on Plaintiffs' E-Commerce Sites to 3rd Party Processor accounts established in the name of companies controlled by the individual defendants, including but not limited to Good Brands, HNB, H&B India, Health, Jagdambe, and XYX Corps. 1-10 (collectively, the "**Corporate Defendants**"), and thereby divert customer payments; (b) Bhatia would change the registrant information of Plaintiffs' websites to, among other, Jagdambe, (c) Bhatia and/or Prianka would cause VNH to pay to register domain names on behalf of Defendants, and the development, operational and promotional costs of Defendants' competitive e-commerce sites;  (c) Bhatia and/or Aparna would open and operate Amazon "webstores" to compete with Plaintiffs, and use Plaintiffs resources to do so;  (d) Bhatia and Aparna would use Bhatia's access to Plaintiffs' warehouses to steal Vita-Pure products and third-party products purchased by VNH for resale; (e) Bhatia would cause VNH to purchase inventory to be sold on Defendants competitive e-commerce sites for which VNH would not be paid;  (f) Bhatia would cause VNH to pay for the development of trademarked brand names for purposes of competing with Plaintiffs;  and (g) the Corporate Defendants would transfer the monies derived from the Fraudulent Scheme to unknown John Does 1-10 and persons controlled and/or affiliated with Defendants, which maintained bank accounts in, among other places, India.

41.     Upon information and belief, between 2010 and 2014, Defendants fraudulently caused 3rd Party Processors to wire hundreds of thousands of dollars in numerous separate payments, derived from hundreds of sales made by Plaintiffs to customers located

throughout the United States and Canada, to bank accounts controlled and/or maintained by Defendants, including but not limited to, accounts located in India and held in the name of Jagdambe and H&B India.

42.     Upon information and belief, between 2010 and 2014, Defendants engaged in numerous separate communications by telephone, e-mail and through the United States mail with (a) 3rd Party Processors; (b) customers located throughout the United States; (c) web designers retained by Prianka on behalf of Defendants (whose services were paid for by VNH); and (d) bulk suppliers and manufacturers of products sold by Defendants.

43.     Upon information and belief, between 2010 and 2014, Defendants made numerous, separate shipments through the United States mails of (a) products sold through the Competitive Sites and (b) inventory to warehouses maintained by Defendants.

44.     Upon information and belief, the Defendants were aware that the Fraudulent Scheme was unlawful and was intended to and did harm Plaintiffs, Plaintiffs' customers who received inferior goods and services, and suppliers, vendor and service providers who were not paid by Defendants and 3rd Party Processors who devoted resources in an effort to redress the fraud in which they became embroiled.

45.     Upon information and belief, Defendants continue to perpetrate the Fraudulent Scheme by diverting web-traffic from Plaintiffs thereby misleading customers, providing customers with inferior products and service, and failing to pay Plaintiffs' suppliers, vendors and service providers who believed that the items and services they were performing for Defendants would be paid by Plaintiffs.

## DEVELOPMENT OF PLAINTIFFS' E-COMMERCE BUSINESSES

A.    **THE WEB SITES**

   (i)  **VitaNherbs.com**

46.       On or about March 31, 2010, in the course of his employment, Bhatia registered the domain VitaNherbs.com in Delta's name and thereafter oversaw the development and launch of a website located at that address on the Internet.

47.       Three months later, on June 23, 2010 Sahasra formed VNH for the purpose of centralizing Vita-Pure's e-commerce initiative.

48.       After VNH was formed, Sahasra directed Bahtia to transfer the registration of VitaNherbs.com from Delta to VNH.

49.       Bhatia had his own ideas.  Instead of abiding by Sahasra's direction, he initiated a series of transfers that enabled Defendants to hijack the site on or about August 21, 2014.

50.       As Plaintiffs have recently discovered in their efforts to regain control of E-Commerce Sites, that (a) on December 16, 2010, Bhatia changed the registrant of VitaNHerbs.com, to "Jagdambe industries [sic]"; (b) on or about April 4, 2011, Bhatia changed the registrant of VitaNherbs.com to "VHN LLC (India)", an entity that has no relationship to VNH;  (c) on or about November 25, 2011, Bhatia again changed the registrant to Domains by Proxy, Inc. (which substitutes its own name for that of the actual registrant in the "Whois" public directory of registered domain names, thus enabling a registrant's identity to remain private); (d) on or about February 13, 2013 Bhatia changed the registrant back to VNH LLC (India); and (e) finally, on July 4, 2013 back to Jagdambe.

51.       Upon information and belief, Bhatia changed the registrant information of

VitaNHerbs.com to Jagdambe with the knowledge and assistance of Ravinder.

52.     Bhatia changed the registrant information of VitaNherbs.com as aforesaid without right or authority, and without Sahasra's knowledge, for the purpose of stealing the domain name and the website operated at that address.

53.     As discussed below, on or about August 21, 2014, Bhatia denied Plaintiffs' access to the VitaNherbs.com website entirely by changing and/or eliminating all log-in credentials other than his own, and began diverting all payments for products purchased through the site.

54.     Upon information and belief, prior to his theft of the website, Bhatia interfered with and/or redirected web traffic from the site to competitive e-commerce sites owned and/or operated by Defendants, jointly, severally and/or collectively.

55.     Upon information and belief, as a result of Bhatia's fraudulent change of the domain registrant information for VitaNherbs.com, and other tortious conduct intended to divert customers, VitaNherbs.com plummeted from $173,293.32 in 2013, to $44,434.31 in the first eight (8) months of 2014.

56.     To date, due to Bhatia's cyber-shell game, GoDaddy.com, LLC ("**GoDaddy**") has declined Plaintiffs' request to restore the VitaNherbs.com domain name to Delta (or VNH), and the internet service provider refused to allow Plaintiffs to access the site's administrative functions.

57.     Upon information and belief, to date Bhatia and Aparna directly and/or through one or more of the remaining defendants continue to operate VitaNherbs.com for their own personal gain, in direct competition with Plaintiffs and are diverting web-traffic from Plaintiffs' e-commerce sites.

**(ii) ShopBestNaturals.com**

58.      On July 15, 2011, Bhatia registered the domain name ShopBestNaturals.com on behalf of VNH, and thereafter oversaw the development and launch of a website that operated from that Internet address.

59.      Initially, sales generated through ShopBestNaturals.com were to have been paid to VNH and, after January 28, 2013, following the formation of Best, paid to Best.

60.      However, unbeknownst to Plaintiffs, some time prior to January 28, 2013, Bhatia established a Paypal payment option on the site that was linked to a bank account held in the name of HNB (the "**HNB Account**").

61.      In February 2013, Sahasra discovered that the Paypal processed payments were being deposited into the HNB Account, and demanded an explanation from Bhatia.

62.      Bhatia represented that the deposits to HNB was an administrative oversight. According to Bhatia, until he had the opportunity to open a Paypal account on behalf of Best, as a matter of expediency, he had linked HNB's Paypal account to ShopBestNaturals.com, and had simply forgotten that he had done so.

63.      Bhatia apologized and promised to transfer all of the Paypal monies that HNB had received to VNH.

64.      Sahasra, who was unfamiliar with the e-commerce business model, relied on Bhatia's representations and accepted his explanation.

65.      Thereafter, Bhatia transferred the sum of $95,000 from HNB to VNH, which he represented to be all of the money received from Paypal through April 30, 2013.

66.      On or about April 23, 2013, Bhatia opened a Paypal account on behalf of Best and linked it to ShopBestNaturals.com as a customer payment option.

67.     Between June 14, 2013 and December 6, 2013, Best received $39,700.31 in ShopBestNaturals.com customer payments processed by Paypal.

68.     Bhatia's "repentance", however, was short lived;  in December 2013, he resumed diverting revenues generated through ShopBestNaturals.com by removing the link to Best's Paypal account from the site and substituting it with a Paypal account that, upon information and belief, was controlled by one or more of the Defendants.

69.     As set forth below, on or about August 24, 2014, Bhatia eliminated all customer payment options for ShopBestNaturals.com, with the exception of the Paypal account controlled by Defendants, and on or about August 26, 2014 deprived Best of administrative access to the site entirely.

70.     Between on or about August 26, 2014, when Best first learned that the only payment option for ShopBestNaturals.com customers was the Paypal account controlled by Bhatia, through on or about September 12, 2014, at which time Best removed the link to Bhatia's Paypal account, Best was compelled to cancel $5,473.00 in customer orders since, had they been filled, payment would have been diverted to Bhatia's account.

71.     To date, Paypal has declined to provide Best with information regarding monies diverted from ShopBestNaturals.com by Bhatia prior to April 23, 2013 and subsequent to August 24, 2014 since Best does not know the password to the Bhatia controlled Paypal account(s).

72.     It was not until on or about September 18, 2014, that Best succeeded in regaining full, operational control of the ShopBestNaturals.com.

73.     Subsequently, Best has learned that Bhatia diverted ShopBestNaturals.com revenues to HNB through two (2) other 3rd Party Processors:  (a) beginning on or about March 8,

2012, Bhatia established an Amazon Simple Pay account that was linked to the HNB Account and through which Bhatia diverted approximately $37,067 in sales; and (b) beginning on or about April 4, 2012, Bhatia established a Google Checkout account that was also linked to the HNB Account and through which Bhatia diverted customer approximately $18,320.95 in sales.

74.     Upon information and belief, as a result of Bhatia/HNB's diversion of ShopBestNaturals.com processed payments, Best's revenues fell from $579,084.26 in 2013 to $99,410.28 through the first eight (8) months of 2014.

**(iii) VitaminsHub.com**

75.     In and around August 2013, Sahasra became aware that VNH was purchasing inventory and/or paying to ship products from its warehouse directly to consumers of "VitaminsHub.com".

76.     Based on Bhatia's fraudulent representations and omissions relating to the VitaminsHub Agreement (defined below), and Sahasra's reliance on Bhatia to managed the Companies' e-commerce businesses, Sahasra believed "Vitaminshub.com" was an extension of VitaminsHub-US and/or VitaminsHub-CA and subject to the VitaminsHub Agreement.

77.     It was only subsequent to the events August 2014 that Sahasra learned that VitaminsHub.com was an independent website and that Aparna had registered the domain name VitaminsHub.com to Good Brands on October 17, 2010.

78.     As a result, since on or about August 25, 2014, at which time Bhatia eliminated Plaintiffs' access to the site, Bhatia, through Good Brands, is in complete control of the domain name VitaminsHub.com and the website located at that address.

79.     In addition, VNH has since learned that Bhatia had, without right or authority, alone or through Good Brands, caused VNH to ship at least $62,013.43 in products to

15

VitaminsHub.com customers for which VNH was never paid.

80.     Further, in October 2014, VNH discovered that Bhatia had, without right or authority, caused VNH, "on behalf of VitaminsHub.com" to purchase $79,650.77 in cosmetic and other items (everything from "Menopause Support" to "Adult Bubble Bath"), all of which are beyond their expiration dates, have virtually no relationship to the Companies' vitamin-based business, and are sitting in VNH's warehouse.

81.     Upon information and belief, Bhatia caused VNH to purchase such products with the intention of selling them through one or more of Competitive Sites.

82.     Upon information and belief, since on or about August 21, 2014 and continuing to date, Bhatia and Aparna directly and/or through one or more of the remaining defendants are operating VitaminsHub.com for their own personal gain, in direct competition with Plaintiffs and are diverting customers from Plaintiffs.

**B.     THE AMAZON WEBSTORES**

83.     According to Amazon, an Amazon webstore "is an all-in-one, full-featured e-Commerce platform that enables [subscribers] to build and operate" an online store that is "completely separate from Amazon.com" but utilizes Amazon's technology including, but not limited to, "merchandising, inventory, order management, and payment processing."

84.     In and around December 2012, Bhatia recommended to Sahasra that VNH open two (2) Amazon webstores.

85.     Although Bhatia justified the opening of two webstores on the basis that two would generate twice the traffic as one, his recommendation was in furtherance of the Fraudulent Scheme.

16

86.     Bhatia informed Sahasra that, purportedly based on Amazon's rules, VNH's "second" store had to be opened in the name of an entity unaffiliated with Sahasra and, to Sahasra's surprise, Bhatia disclosed that he had formed Health for that purpose.

87.     Plaintiffs have since learned that, notwithstanding Bhatia's representation, Bhatia operates multiple Amazon webstores.

88.      In furtherance of the Fraudulent Scheme, Bhatia proposed that Health operate the second Amazon webstore on behalf of VNH, that VNH pay for all operational costs and inventory, and that that every fifteen (15) days, based on what Bhatia represented to be Amazon's payment schedule, Health transfer the revenues generated by that webstore to VNH.

89.     Unfamiliar with Amazon's rules, and in reliance on Bhatia's representations and knowledge of e-commerce, Sahasra deferred to Bhatia and, on behalf of VNH, agreed (hereafter, the "**VitaminsHub Agreement**").

90.     Upon information and belief, Bhatia never intended to abide by the VitaminsHub Agreement.

**(i)     GoodHealthStore**

91.     As agreed, on or about December 21, 2012, Bhatia registered GoodHealthStore with Amazon on behalf of Best and oversaw its operations.

92.     As set forth below, on August 26, 2014, without right or authority, Bhatia eliminated Best's ability to access the Amazon administrative interface for GoodHealthStore.

93.     Amazon restored Best's control of GoodHealthStore on August 28, 2014.

94.     Subsequently, in the course of investigating Defendants' Fraudulent Scheme, Plaintiffs have discovered that Bhatia, without right or authority, caused VNH to purchase approximately $11,001.00 in products through GoodHealthStore which were shipped from East

17

Coast Liquid Filling, located in King of Prussia, Pennsylvania on behalf of

AmazingAyurveda.com, a website that, upon information and belief, is operated by Aparna to

whom that domain name is registered.

95.     Such products purchased have no relationship to Plaintiffs' vitamin-based

business and are presently sitting in GoodHealthStore's Amazon warehouse.

96.     Upon information and belief, Bhatia caused VNH to purchase such products

solely for his own financial gain and that of Aparna, and/or one or more of the remaining

Defendants.

### (ii) **VitaminsHu-US and VitaminsHub-CA**

97.     In December 2012, Bhatia also registered the webstore, VitaminsHub-US,

with Amazon in Health's name, purportedly on behalf of VNH.

98.     Contemporaneously, upon information and belief, Bhatia opened two accounts

with PNC Bank in Health's name, one into which allegedly all revenues generated by the

webstore would be deposited (the "**US Health Account**"), and the other into which Bhatia

represented any future Canada-based VitaminsHub revenues would be deposited (the "**CA**

**Health Account**") (together, the "**Health Accounts**").

99.     Until on or about August 17, 2014, Sahasra and Bhatia both had access to the

Health Accounts, although Bhatia was the only signatory.

100.    A year later, on or about April 19, 2014, in furtherance of the Fraudulent

Scheme, Bhatia represented to Sahasra that he had registered VitaminsHub-CA in Health's

name, revenues generated by the webstore were being deposited into the CA Health Account,

and such monies would be transferred to VNH in accordance with the VitaminsHub Agreement.

101.    Between December 2012 and June 2014, approximately every fifteen (15)

days Bhatia represented to Sahasra that Health had transferred to VNH all monies generated by VitaminsHub-US, VitaminsHub-CA with the exception of a carry-forward, monthly balance of approximately $30,000.

102.     On or about August 25, 2014, Bhatia eliminated the Companies' ability to access the administrative interface for VitaminsHub-US and VitaminsHub-CA (as well as their control of VitaminsHub.com).

103.     VNH has now performed an accounting of the monies generated by VitaminsHub-US, VitaminsHub-CA and VitaminsHub.com, the monies deposited into the Health Accounts, and the monies transferred from those accounts to VNH, for the period from January 1, 2014 through August 21, 2014.

104.     Based on VNH's accounting Health failed (a) to transfer to VNH approximately $406,742.70 in VitaminsHub-US sales, (b) to deposit into the CA Health Account and transfer to VNH approximately $17,508.53 in VitaminsHub-CA sales which were, upon information and belief, deposited into account maintained and/or controlled by one or more of the Defendants; and (c) failed to transfer any monies generated by the website VitaminsHub.com.

105.     Upon information and belief, to date, Bhatia, through Health, and with the assistance of one or more of the remaining Defendants, continue to operate VitaminsHub-US and VitaminsHub-CA for their own personal gain, in direct competition with Plaintiffs, and are diverting web-traffic from GoodHealthStore.

### (iii)  **H&B Concepts India**

106.     Contemporaneously with Bhatia's recommendation that VNH open the Webstores in and around December 2012, and in furtherance of the Fraudulent Scheme, Bhatia

proposed that VNH retain him, in exchange for a flat monthly fee, to outsource the data entry services required to process shipping labels for all of the Amazon webstores to contractors in India.

107.     Bhatia represented that such outsourcing would be more cost-effective, and would enhance efficiency since the services would be performed over-night based on the time-difference between India and North America.

108.     Sahasra, was fully immersed in the manufacturing aspects of Vita-Pure's business and, having no knowledge of the Fraudulent Scheme, was pleased with Bhatia's efforts; accordingly, he agreed.

109.     Thereafter, Bhatia informed Sahasra that he had formed H&B India for the purpose of providing such services and Bhatia, through H&B India, also became responsible for overseeing and replenishing the Amazon warehouses maintained by the Webstores.

110.     Between December 5, 2012 and July 24, 2014, VNH paid H&B India a monthly fee for an aggregate sum of $101,000, by wire transfer directed to an account held in the name of H&B India at a bank located at 64 Thatte Nagar, Vastushri, No. 3, Thatte Nagar, Gangapur College, Link Road, Nashik 422005, Maharashtra, India.

111.     Upon information and belief, Bhatia, through H&B India, and with the direct and knowing assistance of one or more of the Defendants, manipulated the inventory shipments to the respective warehouses maintained by each of the Webstores to the disadvantage of GoodHealthStore and in favor of VitaminsHub-US and in furtherance of the Fraudulent Scheme.

112.     Upon information and belief, Best was damaged by inventory manipulation, and the by Defendants' diversion of customer traffic from GoodHealthStores to VitaminsHub-US as discussed below, as evidenced by the fact that although both webstores were launched in

20

December 2012, their respective 2013 annual revenues were $1,981,831.07 and $6,377,636.87.

113.     Furthermore, in advance of hijacking the E-Commerce Sites, Bhatia, through H&B India, stockpiled as much inventory as possible in VitaminsHub-US's warehouse at VNH's cost.

114.     According to VNH's accounting, in the weeks leading up the events of August 25, 2014, Bhatia caused VNH to purchase and ship over $1,622,767.40 in Vita-Pure products and third-party brands to VitaminsHub-US's warehouse for which VNH was never paid as follows: (a) a total of $829,771.14 by June 30, 2014 in inventory;  (b) on July 14, 2014, another $609,482.47 in inventory;  and (c) on August 14, 2014, an additional $183,513.79 in inventory.

115.     Upon information and belief, Health has sold, and continues to sell, the $1,622,767.40 in VNH inventory through VitaminsHub-US and VitaminsHub-CA, for which VNH was never paid, and has diverted Plaintiffs' customers to those webstores.


## PURE NATURALS, NUTRI ESSENTIALS AND VITAMINSHUB

116.     In furtherance of the Fraudulent Scheme, in the Spring of 2012, Bhatia recommended to Sahasra that Vita-Pure increase sales by developing two (2) additional brands.

117.     Sahasra agreed, and directed Bhatia to proceed to register the names "Pure Naturals" and "Nutri Essentials" with the United States Patent and Trademark Office ("**USPTO**") on behalf of VNH.

118.     In and around January 2014, after the expenditure by VNH of substantial brand-development costs, Vita-Pure began to produce products under both brand names and VNH began selling those items.

119.     Since Bhatia's August 2014 "cyber-attack", Plaintiffs have learned that Bhatia

did not file the trademark registrations for Pure Naturals and Nutri Essentials as instructed by Sahasra; instead, he fraudulently filed the application for Pure Naturals on June 26, 2012 in his own name, and the application for Nutri Essentials on April 4, 2014 in the name of defendant HNB.

120.     On December 5, 2014, Plaintiffs further discovered that on that date the USPTO accepted the Statement of Use application filed for Nutri Essentials, and anticipate the trademark will be registered imminently.

121.     Finally, on December 6, 2014 Plaintiffs learned for the first time that Bhatia, on behalf of HNB, also filed a trademark application for "Vitamins Hub" on July 19, 2012, and that the mark was registered by the USPTO on December 10, 2013.

122.     Defendants utilized the services of attorneys, including but not limited to the firm Raj Abhyanker, P.C., located in Mountain View, California, to file the foregoing trademark applications and, in doing so, upon information and belief, fraudulently represented to such attorneys, directly or by omission, that Defendants were entitled to file such registrations in the names of Bhatia and HNB.

123.     Similarly, Plaintiffs have learned that Bhatia and/or Aparna caused third-parties such as GoDaddy.com, LLC ("**Go Daddy**") to register the domain names Nutri-Essentials.com, Nutri-Essentials.net, Nutri-Essentials.com, Nutri-Essentials.us, NutriEssentials.net to Health, Good Brands and/or one or more of the Defendants.

124.     Unless HNB is restrained and/or Ordered to transfer the Pure Naturals, Nutri Essentials, and Vitamins Hub trademarks (collectively, the "**Trademarks**") to VNH, Plaintiffs will be reparably harmed.

## BHATIA'S EXTORTION

125.     In and around September or October 2013, Sahasra asked Bhatia about a $10,000 check payable to the law firm Fricker & Shim, LLC ("**Fricker**"), which he had noticed while reviewing the Health Accounts.

126.     Bhatia replied that although Vita-Pure's VISA petition on his behalf had been filed on or about September 12, 2011, he was purportedly not satisfied with the services of the immigration law firm that Vita-Pure had retained, had retained Fricker, and wanted the petition to be refiled through VNH notwithstanding the delay this would create.

127.     In a good faith effort to accommodate Bhatia, Sahasra agreed and a new petition was filed by VNH and VNH thereafter paid all expenses associated with Bhatia's application for a green card.

128.     VNH's VISA petition was approved on or about February 25, 2014.

129.     On or about July 15, 2014, Bhatia purported to leave for a month-long vacation to visit his family in India, and returned to work on or about August 17, 2014.

130.     In Bhatia's absence, Health did not make the 15-day transfers to VNH in accordance with the VitaminsHub Agreement and, as a result, the Health Accounts developed a substantial surplus based on July and August sales.

131.     As of on or about August 17, 2014, when Sahasra last reviewed the accounts, the balance of the US Health Account exceeded $536,000 and that of the CA Account exceeded $136,000.

132.     On or about August 18, 2014, following Bhatia's return from India, he suggested that he and Sahasra meet for lunch.

133.     During the meeting, Bhatia demanded a fifty-percent (50%) equity and profit

interest in all of Plaintiffs' e-commerce businesses.

134.    Sahasra was surprised, replied that Bhatia was being well compensated and refused.

135.    Sahasra also told Bhatia that Health needed to transfer the surplus balance in the Health Accounts to VNH in accordance with the VitaminsHub Agreement.

136.    On or about the evening of August 19, 2014, Bhatia met Sahasra at Vita-Pure's offices and provided him with two (2) executed Health checks: (a) check number 1041 dated August 20, 2014 payable to VNH in the amount of $200,000; and (b) check number 1145 which was signed in blank with no designated payee.

137.    Bhatia told Sahasra that he would advise him with the next few days the amount that check number 1145 should be made out for, after he had reconciled return purchases made through VitaminsHub-US and VitaminsHub-CA.

138.    The next evening, on or about August 20, 2014, Bhatia went to Sahasra's office again demanded half of Companies' e-commerce businesses.

139.    When Sahasra refused, Bhatia threatened that "it would not be you good for you [Sahasra]."

140.    Bhatia also refused to transfer to VNH the approximate $500,000 balance due from Health.

141.    Sahasra replied that if Bhatia refused to turn over his money he would be required to take legal action.

142.    Bhatia then disclosed to Sahasra, for the first time, that he had received his green-card on a "self-employed" basis and walked out of the office.

## BHATIA LOOTS PLAINTIFFS' OFFICES AND
## HIGH-JACKS THE E-COMMERCE SITES

143.     According to VNH's surveillance cameras, on August 21, 2014, Bhatia entered the Companies' Roselle offices empty-handed at 4:52:07 PM, and less than one minute later, at approximately 4:52:54 PM left with a medium-size shoulder bag the contents of which are unknown.

144.     On the morning of Friday, August 22, 2014, VNH employees found that they were unable to access the electronic inventory records for VitaminsHub-US and VitaminsHub-CA.

145.     Sahasra telephoned Bhatia to inform him of what Sahasra assumed was a technical issue, to which Bhatia responded that he would, in effect, address the problem.

146.     On Monday, August 25, 2014, however, the Companies discovered that the employee user accounts had been deactivated and/or changed such that they were unable access any information for VitaminsHub-US and VitaminsHub-CA and VitaNHerbs.com.

147.     After efforts to contact Bhatia by telephone, e-mail and text-message proved futile, Plaintiffs discovered that Bhatia had emptied his office of personal belongings and, without right or authority, taken the Stolen Computers and files containing Proprietary Information (including business contacts, trademark information and VNH's marketing materials).

148.     By August 26, 2014, Bhatia had still not responded to Plaintiffs' efforts to reach him, and had succeeded in disabling Plaintiffs' ability to access all of the E-Commerce Sites entirely, deprived Plaintiffs of access to their 3rd Party Processor accounts, and Sahasra no longer was able to access Health's PNC accounts on-line.

149.     Accordingly, on August 26, 2014, Sahasra wrote to Bhatia, confirmed that he

had abandoned his job with VNH, and demanded that he restore Plaintiffs' administrative access to the E-Commerce Sites.

150.     Plaintiffs also filed a report with the Kenilworth Police Department, although, at that time, the scope of Bhatia's illegal conduct was not yet known.

151.     Upon information and belief, despite Bhatia's abandonment of his job, Bhatia, directly or indirectly through one or more of the remaining Defendants, without right or authority, continues to access, intercept, monitor and review e-mails, contemporaneously with their transmission.

152.     Plaintiffs are unable to disable Bhatia's access to the E-mail System since they do not know the passwords that Bhatia used to establish same.

## DEFENDANTS' ILLEGAL AND TORTIOUS CONDUCT HAS AND IS CAUSING PLAINTIFFS IRREPARABLE HARM

153.     Since August 2014, the Companies have devoted an enormous amount of time and resources attempting to restore and resume their e-commerce businesses, terminate Defendants illegal access to its computers, computer networks and e-mails, to unwind the Gordian Knot of fraud and cybercrime committed by Defendants.

### A.     Defendants' Competitive E-Commerce Sites

154.     As indicated above, Plaintiffs have learned that during the course of Bhatia's employment, he, Aparna and Prianka, directly and by and through the Corporate Defendants, developed and have been operating multiple businesses and the Competitive Sites in direct competition Plaintiffs, and used VNH's resources to do so, including VNH vendors, clients and Proprietary Information.

26

155.     In addition to Aparna having registered VitaminsHub.com to defendant Good

Brands, and Good Brands having retained all monies generated by that site, Aparna registered at

least two (2) other domain names to Good Brands, Amazing Ayuraveda.com and

BeautyAura.com and Defendants are operating websites at both of those addresses, all of which

VNH unwittingly funded.

156.     Similarly, upon information and belief, Bhatia and/or Aparna, directly or by

and through Health, have been operating at least five (5) Amazon webstores, including

ClickStores, Good Brands, Vitaminstore, AmazingNutritional, and BeautyAura all of which

market and sell vitamins and dietary supplements including, but not limited, to Vita-Pure and

Best Naturals brand-name products in direct competition with Plaintiffs.

157.     Further, since August 25, 2014, Bhatia has attempted to recruit at least two (2)

VNH employees to work for Defendants' competitive companies.

158.     Last week, VNH discovered that Defendants had caused VNH to pay for

development of their websites and, upon information and belief, search optimization services to

re-direct web-traffic from Plaintiffs' sites to the Competitive Sites.

159.     As set forth above, Bhatia's responsibilities included overseeing the design

and development of the Websites on behalf of Plaintiffs, which he did by retaining free-lance

website designers on behalf of VNH through services such as oDesk Corporation ("**oDesk**").

160.     According to oDesk's websites, its global headquarters are based in Mountain

View, California, and the oDesk "platform"

> allows Clients and Freelancers to identify each other and enable them to buy and
> sell Services online. …. Clients post jobs and invite Freelancers to apply.
> Freelancers post profiles and bid on jobs. If a Client and Freelancer agree on
> terms, a Service Contract is formed directly between such Client and Freelancer
> … oDesk pays Freelancers in connection with their delivery of services through
> the oDesk platform. oDesk collects payment from Clients in connection with their

27

receipt of services through the oDesk platform.

See, www.odesk.com/info/terms.

161.     Last week, in the course of investigating the scope of the Fraudulent Scheme, VNH learned that "its" oDesk Client account, through which it had paid over $27,000 in fees, was opened in the name of Prianka.

162.     Upon information and belief, Prianka fraudulently held herself out to oDesk as a representative of VNH and as authorized to incur expenses on behalf of VNH, and retained free lancers to perform web design and/or search optimization services for Defendants for which VNH paid.

163.     In addition, Bhatia and/or Aparna and/or Prianka, through third parties such as oDesk and/or Go Daddy have registered numerous domain names, including but not limited to, Vita-Pure.com, and are unfairly utilizing metatags for the purposes of diverting traffic from the E-Commerce Sites, causing customer confusion and/or, upon information and belief, extracting monies from Plaintiffs in exchange for the right to a domain name that clearly violates Vita-Pure's trademark rights.

**B.     Interception of Plaintiffs' E-mails**

164.     As set forth above, Bhatia had full administrative control of the E-Mail System, access to the e-mail accounts used by Plaintiffs' employees, and all administrative passwords are known to him alone.

165.     Plaintiffs are unable to disable Bhatia's access to the E-Mail System, which includes the individual "sub accounts" used by Plaintiffs' employees, since Plaintiffs do not know the administrative passcode that Bhatia used to establish the master e-mail account.

166.     Accordingly, since on or about August 26, 2014, Plaintiffs have been using

28

alternative e-mail addresses, although one or more third parties have inadvertently directed e-mails to the addresses to which Bhatia has access.

167.     Upon information and belief, following Bhatia's abandonment of his position, and continuing to date, Bhatia has accessed, monitored, reviewed, copied and/or intercepted e-mails, contemporaneously with their transmission, between Plaintiffs' employees and Plaintiffs' suppliers, customers, vendors and other third parties, with the direct assistance of one or more of the remaining Defendants.

168.     Such e-mails included, among other matters, Plaintiffs' confidential business information, Proprietary Information, and attachments that constitute Plaintiffs' property.

## C.     Health's Vendor Central Account

169.     Plaintiffs have also learned since the August hijacking, that in July 2013, Bhatia established an Amazon Vendor Central account on behalf of Health (the "**Vendor Central Account**").

170.     Upon information and belief, a Vendor Central Account is one through which Amazon purchases products from vendors that it then resells directly to consumers.

171.     At all times, Bhatia caused VNH, without Sahasra's knowledge, to pay for the inventory and operational costs associated with Health's Vendor Central Account including over $435,395.26 in products between July 29, 2013 and August 28, 2014, which Bhatia had shipped to Amazon and for which VNH received no payment.

## NEED FOR RESTRAINTS

172.     Bhatia's and Aparna's conduct, with the direct and/or indirect assistance of the remaining Defendants, establishes that Defendants have, among other things, (a) sabotaged

Plaintiffs' e-commerce businesses and E-Commerce Sites, (b) stolen Plaintiffs' Proprietary

Information, inventory, monies and property, (c) tortiously interfered with Plaintiffs' customer

orders, (d) solicited employees of VNH to terminate their business relationship with VNH, (e)

are utilizing Plaintiffs' Proprietary Information to the Competitive Sites; and (f) launched their

own line of brand-name products, at Plaintiffs' expense, which they continue to sell.

173.     Defendants' conduct, as aforesaid, establishes that they have harmed

Plaintiffs' legitimate business interests and will cause irreparable harm to those interests if they

are not temporarily, preliminarily and permanently, enjoined and restrained by this Court.


## COUNT ONE

### FRAUD AND NEGLIGENT MISREPRESENTATION
### (Against – Bhatia and Aparna)

174.     Plaintiffs repeat and reallege all of the previous allegations contained in the

Complaint as if same were fully set forth herein at length.

175.     Bhatia and/or Aparna, individually and on behalf all of the Defendants,

falsely, knowingly, intentionally and maliciously and/or negligently, whether directly and/or by

omission, misrepresented to Plaintiffs, inter alia, that (a) the deposit of ShopBestNaturals.com

customer payments processed by Paypal to the HNB Account was an "administrative oversight"

when, in fact, Bhatia, by and through HNB, intentionally diverted those monies with no intention

of transferring them to VNH or Best; (b) all monies generated by VitaminsHub-US and

VitaminsHub-CA had been deposited into the Health Accounts when, in fact they had not; (c) the

inventory purchased by VNH and shipped between on or about June 2014 and August 2014 to

VitaminsHub-US's warehouse would be sold for the benefit of VNH, when, in fact, Bhatia and,

upon information and belief, one or more of the Defendants, sold such inventory for their own

financial gain through the Competitive Sites; (d) Bhatia only used VNH's credit card to purchase goods and services for the benefit of Plaintiffs when, in fact, a substantial portion of such goods and services were for the benefit of Defendants and in furtherance of the Fraudulent Scheme.

176.    In addition, fraudulently omitted informing Plaintiffs, inter alia, that (a) Aparna had registered the domain name VitaminsHub.com to Good Brands in October;  (b) Bhatia had caused VNH to pay for all inventory and labor costs associated with the operation of VitaminsHub.com and Defendants were retraining all revenues realized from such sales; and (c) Bhatia had opened an Amazon Vendor Account, caused VNH to pay for all inventory sold through the account and all operational costs, and Defendants had retained all payment made by Amazon in connection with such sales.

177.    Further, Bhatia prepared, or directed others to prepare, invoices requesting payments from customers that had unknowingly been diverted from Plaintiffs' E-Commerce Sites to the Competitive Sites, and invoices requesting payment on behalf of H&B India for services performed or in excess of those performed and as a pretense to enable H&B India to manipulate VNH's inventory shipments, and/or for services never performed.

178.    Bhatia and/or Aparna, personally and/or through one or more of the Corporate Defendants, falsely knowingly, intentionally and maliciously and/or negligently, directly and/or by omission, held themselves out to unsuspecting third parties including, but not limited to, agents of oDesk, GoDaddy, Domains by Proxy, Inc., Amazon, Amazon Simple Pay, Paypal, and Google Pay, as authorized by one or more of the Plaintiffs (a) to change the domain registrant information for VitaNHerbs.com and transfer the hosting of the website operated at that address to a new internet service provider; (b) to eliminate VNH's right and ability to access the domain registration information for ShopBestNaturals.com and the website located at that address, (c) to

establish 3rd Party Processor payment options for the E-Commerce Sites that were were linked to bank accounts controlled by Bhatia directly and/or through HNB and, upon information and belief, one or more of the remaining Defendants; (d) to engage web designer and related specialists through oDesk for the purpose of, upon information and belief, providing services in connection with the Competitive Sites and to cause VNH to pay for such services and (e) to purchase goods and other services in the name of VNH but for the purpose of developing and operating the Competitive Sites for the benefit of Defendants.

179.    Bhatia, Aparna and Prianka made the foregoing intentional and/or negligent misrepresentations, and failed to state material facts, individually and on behalf of the Corporate Defendants, during conferences in Plaintiffs' offices, during telephone calls between the parties, and in writing by e-mail and "telephone text."

180.    Bhatia, Aparna and Prianka knew, or reasonably should have known, that the numerous intentionally and/or negligently false statements and omissions would induce Vita-Pure to continue to employ Bhatia, permit him to manage Plaintiffs' e-commerce businesses and use VNH's credit card to fund the Competitive Sites, while, all the time, Defendants pursued their Fraudulent Scheme.

181.    The aforesaid intentional and/or negligent misrepresentations and omissions by were willful, wanton, malicious, and/or in reckless disregard of Plaintiffs' rights.

182.    As a direct and proximate result of Defendants' fraudulent conduct, Plaintiffs have sustained substantial and continuing damages.

## COUNT TWO

### FRAUD IN THE INDUCEMENT
### (VitaminsHub Agreement – Bhatia and Health)

183.   Plaintiffs repeat and reallege all of the previous allegations contained in the Complaint as if same were fully set forth herein at length.

184.   Based on Bhatia's continuous pattern of deceit and misrepresentations beginning in and around December 2010, it is apparent at the time he entered into the VitaminsHub Agreement, Bhatia never intended to abide by their terms and, in fact, did not.

185.   Prior to entering into the VitaminsHub Agreement, Bhatia knowingly made false and misleading promises, individually and on behalf of Health including, but not limited to, that (a) Health would operate VitaminsHub-US, VitaminsHub-CA at all times for the benefit of VNH, when, in fact, it did not; (b) all revenues generated by those webstores would be deposited into either the US Health Account or the CA Health Account, when in fact, they were not; (c) each month Bhatia would cause Health to transfer all revenues generated by those webstores to VNH when, in fact, all such revenues were not transferred.

186.   VNH believed Bhatia's representations to be truthful and reasonably relied upon them when it entered into the VitaminsHub Agreement.

187.   The aforementioned statements and representations by Bhatia, individually and on behalf of Health and/or one or more of the remaining Defendants, were false and fraudulent at the time they were made, were known by Bhatia to be false and were made for the specific purpose and with the intent of misleading VNH so as to enable Bhatia, through Health, to obtain benefits and profits to which he was not entitled and entirely at the cost of VNH.

188.   At the time such statements and representations were made, Bhatia intended, individually and on behalf of Health, to induce VNH to enter into the VitaminsHub Agreement,

33

which VNH would not have otherwise entered.

189.    Bhatia's representation and omissions, individually and on behalf of Health, were fraudulent and, as a result VNH has sustained substantial and continuing damages.

## COUNT THREE

### VIOLATIONS OF RICO - N.J.S.A. 2C:41-2(c) and (d)
### (All Defendants)

190.    Plaintiffs repeat and reallege all of the previous allegations contained in the Complaint as if same were fully set forth herein at length.

191.    At relevant all times, each of the Defendants, Ravinder, Prianka and Jagdambe (collectively, the "**RICO Members**") was a person as that term is defined under N.J.S.A. 2C:41-1 et seq. (the "**NJ RICO Act**")

192.    At all relevant times, the RICO Members acted with the knowledge and intent required to violate the statutes identified as racketeering activity below and/or were willfully blind to or deliberately ignorant of the falsity of the information they conveyed to Plaintiffs, and other third parties, including but not limited to, internet users who were diverted to the Competitive Sites, web designers who performed services for Defendants but who were paid by VNH and 3rd Party Processors.

193.    Since 2010 and continuing to date, in the State of New Jersey, California, all States in which Defendants market and sell products through the Competitive Sites and/or the 3rd Party Processors utilized by Defendants maintain places of business, and in Canada and India, the RICO Members directly and indirectly, singularly or collectively, have engaged a pattern of racketeering activity through their agreement to participate in, and actual participation in, an association-in-fact enterprise (the "**Enterprise**") with the purpose of perpetuating the Fraudulent

Scheme.

194.     Upon information and belief, the Enterprise includes at least the following persons, businesses or other legal entities that played the following discrete and well-defined roles in the RICO Members' carefully planned and highly organized scheme:

  a. Bhatia and/or Aparna who, abused Bhatia's position of trust and his employment with Vita-Pure to induce VNH to enter VitaminsHub Agreement, to convert VNH inventory and cause such inventory to be sold on the Competitive Sites that Prianka registered to the Corporate Defendants, to convert Plaintiffs' customer payments by establishing payment options on the E-Commerce Sites with 3rd Party Processors that were linked to the Corporate Defendants' bank account, to cause VNH to pay for all costs associated with the Competitive Sites, the Trademarks and the launch of the Defendants' competitive businesses.

  b. The Corporate Defendants and Jagdambe to which the domain names of the Competitive Sites were registered or wrongfully transferred, and through which the Competitive Site were operated, and to which Plaintiffs' customer payments were diverted.

  c. Bhatia, Aparna and Prianka who registered the domain names used by the Competitive Sites, registered domain names intended to divert traffic from the E-Commerce Sites, oversaw the design and operations of the Competitive Sites, and operated the Corporate Defendants.

195.     The RICO Members played specific and well-defined roles in the Fraudulent Scheme as described above, and shared the common purpose of defrauding Plaintiffs and other third parties for pecuniary gain through the Fraudulent Scheme.

196.     At all relevant times, the Enterprise was engaged in activities that would and did affect interstate commerce.

197.     The Enterprise is an enterprise within the meaning of N.J.S.A. 2C:41-1(c).

198.     For the purpose of executing the Fraudulent Scheme, the RICO Members engaged in a pattern of racketeering activity within the meaning of N.J.SA. 2C:41-1(d) since there were

two or more separate and distinct predicate acts between  2010 to 2014 and, upon information and belief, beyond, and because the incidents of racketeering conduct were not isolated incidents, but instead had the same or similar purpose, results, participants, victims, and/or methods of commission.

199.    More specifically, the acts of the RICO Members constitute "racketeering activity," as that term is defined in N.J.S.A. 20:41-1(2), which incorporates any conduct defined as "racketeering activity" under 18 U.S.C. 1961(A) (B) and (D), in that the RICO Members repeatedly and regularly used the U.S. Mail and interstate wire facilities to transmit and/or caused to be transmitted, through interstate commerce, materially false and fraudulent instructions to web designers and 3rd Party Processors, invoices to customers wrongfully diverted from Plaintiffs who were unaware of such diversion, engaged in interstate communications for purposes of conducting the Enterprise, transferred monies converted directly from Plaintiffs and through the diversion of Plaintiffs' customers, and caused VNH to transmit payments to suppliers, domain name registration services and web designers who believed that such items and services were provided to  Plaintiffs when, in fact, they were provided to the Defendants,  all by means of the United States mail, e-mail and other wire communications in violation, inter alia, of 18 U.S.C. § 1341 (mail fraud), 18 U.S.C. § 1343 (wire fraud).

200.    In addition, Defendants acts as aforesaid constitute violations of 18 U.S. Code § 2314 et seq. (transportation of stolen goods), 18 U.S. Code § 1951(interference with commerce), 18 U.S. Code § 1957 (engaging in monetary transactions in property derived from specified unlawful activity), 18 U.S. Code § 2314 (transportation of stolen goods, securities, moneys, etc.) as set forth in 18 U.S.C. § 1961(1)(B).

201.    Each act in violation of the foregoing statutes constitutes a separate and distinct

predicate act.

202.     In addition, on two or more occasions the RICO Members violated, attempted to violate, solicited another to violate, conspired to violate or engaged in intentional acts that violated N.J.S.A. 2C:20-4 (theft by deception), 2C:20-7 (receiving stolen property), 2C:20-8 (theft of services)**,** 2C:20-9 (theft by failure to make required disposition of property received), 2C:20-25 (computer criminal activity), 2C:20-31 (wrongful access, disclosure of information), 2C:21-6 (credit card theft),  N.J.S.A. 2C:21-7 (deceptive business practices), **N.J.S.A. 2C:2-6** (**complicity**) N.J.S.A. 2C:2-7 (corporate criminal act liability) and 15 U.S.C. § 45 (Unfair Deceptive Practices Act), all of which constitute racketeering activity pursuant to N.J.S.A. 2C:41-1(a)(n) and (o).

203.     The incidents of racketeering activity committed by the RICO Members in furtherance of the Fraudulent Scheme have, among other things, the same or similar intents, results, victims, and methods of commission.

204.     The acts of racketeering activity committed by RICO Members have the same or similar intents in that they sought to obtain property including, but not limited to, VNH's money, Vita-Pure products, the Trademarks and, upon information, money and services of other non-parties through illegal means.

205.     The acts of racketeering activity committed by the RICO Members have the same or similar results in that the RICO Members actually obtained property including, but not limited to, VNH's money, Vita-Pure products and, upon information and belief, money and services of other non-parties through illegal means.

206.     The acts of racketeering activity committed by RICO Members have the same or similar victims:  Plaintiffs, consumers and third parties who were deceived by Defendants'

fraudulent statements and omissions.

207.    The acts of racketeering activity committed by RICO Members involve the same or similar methods of commission, the same or similar types of misrepresentations or omissions, the same or similar benefits to RICO Members, and resulted in the same or similar injuries.

208.    The RICO Members intend to continue the Enterprise and their pattern of racketeering activity, thereby causing continued economic injury, unless they are enjoined and restrained.

209.    The RICO Members violated, inter alia, N.J.S.A. 2C:41-2(c) by associating with the Enterprise and conducting or participating, indirectly or indirectly, in the Enterprise through a pattern of racketeering activity.

210.    The RICO Members also violated N.J.S.A. 2C:41-2(d) by conspiring together and with others to violate N.J.S.A. 2C:41-2(c).

211.    In furtherance of that conspiracy, the RICO Members committed overt acts that include, but are not limited to the racketeering activity alleged above.

212.    The RICO Members directly targeted Plaintiffs and, as a result, Plaintiffs' injuries flow directly from acts of racketeering activity committed by RICO Members that constitute part of the pattern of racketeering activity.

213.    Plaintiffs has sustained, and continue to sustain, substantial injuries to their business and property as a direct and proximate result of the RICO Members' violations of, inter alia, N.J.S.A. 2C:41-2, and they are entitled to recover three times the actual damages they have sustained pursuant to N.J.S.A. 2C:41-4(c).

**COUNT FOUR**

**VIOLATIONS OF RICO - 18 U.S.C. 1962(c) and (d)**
**(All Defendants)**

214.    Plaintiffs repeat the preceding paragraphs and incorporates them herein as if set forth at length.

215.    At all relevant times, the RICO Members were each a person as that term is defined in 18 U.S.C. §§ 1961(3), and 1964(c).

216.    At all relevant times the RICO Members were associated with the Enterprise.

217.    At all relevant times, the Enterprise was an association-in-fact "enterprise" within the meaning of 18 U.S.C. § 1961(4).

218.    The Enterprise has a purpose and structure distinct from that inherent in the conduct of the RICO Members' pattern of racketeering in that the Enterprise's business is to conduct the Fraudulent Scheme.

219.    At all relevant times, the Enterprise was engaged in, and its activities affected, interstate commerce within the meaning 18 U.S.C. § 1962(c).

220.    Through their wrongful conduct as alleged herein, the RICO Members, in violation of, inter alia, 18 U.S.C. § 1962(c), conducted and participated in the affairs of the Enterprise, directly and indirectly, singularly or collectively,  through a "pattern of racketeering activity," as defined in 18 U.S.C. § 1961(1) and (5) as more particularly described above.

221.    Since 2010 to the present, the RICO Members have and continue to commit, multiple predicate acts of "racketeering activity," as defined in 18 U.S.C. § 1961(5), in furtherance of the Fraudulent Scheme in violation of 18 U.S.C. § 1343 and 18 U.S.C. §1961(1)(B).

222.    Each of the RICO Members also violated 18 U.S.C. § 1962(d) by knowingly and

39

willingly participating in a conspiracy to defraud Plaintiffs and others.

223.    Plaintiffs have sustained substantial injuries to their business and property as a direct and proximate result of the RICO Members violations of 18 U.S.C. § 1962(c) and (d) as described herein, and within the meaning of 18 U.S.C. § 1964(c).


**COUNT FIVE**

**CIVIL CONSPIRCY**
**(All Defendants)**

224.    Plaintiffs repeat the preceding paragraphs and incorporates them herein as if set forth at length.

225.    Beginning in and around 2010, Defendants together or in a combination of at least two of them, acted in concert to perpetrate the Fraudulent Scheme and in furtherance thereof, to commit the illegal acts described above.

226.    Defendants agreed to participate in the Fraudulent Scheme and violate the laws of the State of New Jersey and the United States of America.

227.    The Defendants' conduct was and is a willful and wanton disregard of the rights and welfare of Plaintiffs and, upon information and belief, others, including but not limited to, the web designers who unwittingly performed services on behalf of the Corporate Defendants, 3rd Party Processors and consumers.

228.    Defendants, acting in concert to affect these unlawful and wrongful acts and omissions, caused and continue to cause injury and damages to Plaintiffs and others.

229.    The conduct and actions of the Defendants that have caused and/or threaten to cause injury or damage were deliberate acts or omissions taken with knowledge of a high degree of probability of harm and/or reckless indifference to the consequences thereof.

230.    As a direct and proximate result of Defendants' fraudulent conduct, Plaintiffs have sustained damages.


## COUNT SIX

### VIOLATIONS OF THE FEDERAL COMPUTER FRAUD AND ABUSE ACT, 18 U.S.C. § 1030
### (All Defendants)

231.    Plaintiffs repeat the preceding paragraphs and incorporates them herein as if set forth at length.

232.    In the course of conducting business, Plaintiffs utilize VNH's computers and computer network in interstate commerce by, transmitting and receiving electronic communications to and from non-parties throughout the United States, viewing sales, payment, and inventory records in the data bases maintained by, inter alia, Amazon and 3rd Party Processors on behalf of Plaintiffs, and monitoring Plaintiffs' customer reviews and E-Commerce Sites, all by way of the Internet.

233.    As such, pursuant to 18 U.S.C. §1030(e)(2)(B), each of VNH's computers, including but not limited to the Stolen Computers, and VNH's computer network, constitute  "a protected computer."

234.    Upon information and belief, Bhatia copied e-mails, and other electronically stored information (**"ESI"**), including documents that contain or constitute Proprietary Information, resident on Plaintiffs' computers and network and transferred that information to the Stolen Computers and/or flash drives, storage devices and/or his home computers directly and by way of remote access for the unlawful purpose of disrupting and/or hijacking Plaintiffs' e-commerce business, and/or gaining an unfair competitive advantage over Plaintiffs.

235.     In addition, on or about August 21, 2014, Bhatia removed the Stolen Computers from Plaintiffs' offices and, upon information and belief, accessed Plaintiffs' computers and/or network to (a) delete ESI, which is Plaintiffs' property, that formerly resided on Bhatia's VNH-assigned computer, rendering such information irretrievable, (b) change and/or delete the passcodes used by Plaintiffs' employees to access the software programs resident on Plaintiffs' computers, (c) disable Plaintiffs' access to the administrative functions of all of the E-Commerce Sites, (d) review, monitor and/or intercept e-mails directed to Plaintiffs, and (e) permanently deprive Plaintiffs of their operational control of VitaNHerbs.com, VitaminsHub.com, VitaminsHub-US and VitaminsHub-CA .

236.     Bhatia had no right or authority (a) to access, use, and/or change, Plaintiffs' computer network, Plaintiffs' computers and the software programs resident on and/or accessible through such computers and network, and/or (b) to access, use, copy, delete and/or transfer ESI resident on and/or accessible through Plaintiffs' computers and network, for any for any purpose other than to fulfill his obligations under the Employment Agreement.

237.     In view of the Fraudulent Scheme and/or Bhatia's abandonment of his position, Bhatia had no right or authority, to access Plaintiffs' computers, computer network, or the ESI and the computer programs resident on such computers and network.

238.     Bhatia violated the Computer Related Offenses Act, inter alia, by purposely, knowingly, and without authorization, altering, damaging and destroying Plaintiffs' ESI with, upon information and belief, the direct or indirect, knowing assistance of Defendants.

239.     Defendants' conduct has damaged Plaintiffs' computer data since, among other things, its "availability" to Plaintiffs has been impaired. 18 USC §1030(e)(8).

240.     Plaintiffs have expended in excess of $5,000 attempting to retrieve its computers,

determine the scope of the ESI copied, transmitted and/or deleted by Defendants, and terminating Bhatia's access to VNH's computer network.

241.     The aforesaid conduct of said Defendants was willful, wanton, malicious and/or in reckless disregard of Plaintiffs' rights.

242.     As a direct and proximate result of Defendants' violations of 18 USC §1030, Plaintiffs have suffered and continue to suffer substantial damages.

**COUNT SEVEN**

**VIOLATIONS OF NEW JERSEY'S COMPUTER-RELATED
OFFENSES ACT, N.J.S.A. 2A:38A-3
<u>(All Defendants)</u>**

243.     Plaintiffs repeat the preceding paragraphs and incorporates them herein as if set forth at length.

244.     Bhatia, with the direct or indirect assistance of the remaining Defendants purposefully, knowingly, and without authorization, removed the Stolen Computers from Plaintiffs' offices, and removed and/or deleted Plaintiffs' ESI, thereby depriving Plaintiffs of access to both in violation of, <u>inter alia</u>, New Jersey's Computer-Related Offenses Act.

245.     In addition, said defendants and their respective agents, purposefully, knowingly, and without authorization, "access[ed] or attempt[ed] to access" ESI on Plaintiffs' computers including, but not limited to, the Stolen Computers, computer network and the e-mails transmitted through such network in violation of, <u>inter alia</u>, the Computer-Related Offenses Act.

246.     In addition, upon information and belief, said Defendants have violated the Computer-Related Offenses Act, <u>inter alia</u>, by purposefully and/or knowingly, and/without authorization  altering, damaging, or destroying Plaintiffs' ESI.

247.     The aforesaid conduct of said Defendants was willful, wanton, malicious and/or

in reckless disregard of Plaintiffs' rights.

248.    As a direct and proximate result of Defendants' violations of the Computer-Related Offenses Act, as aforesaid, Plaintiffs have suffered and continue to suffer substantial damages.

## COUNT EIGHT

### VIOLATIONS OF NEW JERSEY'S WIRETAPPING AND ELECTRONIC SURVEILLANCE CONTROL ACT, N.J.S.A. 2A:156A–27 <br> <u>(All Defendants)</u>

249.    Plaintiffs repeat the preceding paragraphs and incorporates them herein as if set forth at length.

250.    Upon information and belief, since August 21, 2014 and continuing to date, Bhatia with the knowledge and assistance of one or more of the remaining Defendants, has continued to monitor and intercept e-mails in transmission between and/or among Plaintiffs' employees and customers, suppliers, service providers and other third parties.

251.    Upon information and belief, prior to August 21, 2014, Bhatia, with the knowledge and assistance of one or more of the remaining Defendants, monitored and intercepted e-mails in transmission between and/or among Plaintiffs' employees and customers, suppliers, service providers, and other third parties in furtherance of the Fraudulent Scheme.

252.    By unlawfully intercepting, disclosing and using Plaintiffs' e-mails, Defendants violated New Jersey's Wiretapping and Electronic Surveillance Control Act, N.J.S.A. 2A:156A-27 (the "**NJ Wiretap Act**").

253.    As a direct and proximate result of Defendants' violations of the NJ Wiretap Act as aforesaid, Plaintiffs have suffered and continue to suffer substantial damages.

## COUNT NINE

## FEDERAL STORED COMMUNICATIONS ACT, 18 U.S.C. § 2701
### (All Defendants)

254.     Plaintiffs repeat the preceding paragraphs and incorporates them herein as if set forth at length.

255.     Bhatia and, upon information belief, one or more of the remaining Defendants, accessed, copied, deleted, and reviewed e-mails that were in storage and resident on Plaintiffs' computers and/or computer network.

256.     By engaging in the foregoing acts, Defendants violated the Federal Stored Communications Act.

257.     As a direct and proximate result of Defendants' violations of the Federal Stored Communications Act, Plaintiffs have suffered and continue to suffer substantial damages.

## COUNT TEN

## BREACHES OF THE EMPLOYMENT AGREEMENT
### (Bhatia)

258.     Plaintiffs repeat the preceding paragraphs and incorporates them herein as if set forth at length.

259.     Bhatia's conduct, as aforesaid, constitutes, *inter alia*, breaches of the Employment Agreement.

260.     As a direct and proximate result thereof, Plaintiffs have sustained substantial damages and will continue to suffer damages unless Bhatia is enjoined and restrained.

## COUNT ELEVEN

### BREACHES OF THE VITAMINSHUB AGREEMENT
### (Bhatia and Health)

261.    Plaintiffs repeat the preceding paragraphs and incorporates them herein as if set forth at length.

262.    Bhatia and Health's conduct, as aforesaid, constitutes, *inter alia*, breaches of the VitaminsHub Agreement.

263.    As a direct and proximate result thereof, Plaintiffs have sustained substantial damages and will continue to suffer damages unless Bhatia is enjoined and restrained.

## COUNT TWELVE

### BREACHES OF THE DUTY OF GOOD FAITH AND FAIR DEALING
### (Bhatia and Health)

264.    Plaintiffs repeat the preceding paragraphs and incorporates them herein as if set forth at length

265.    The Employment Agreement and VitaminsHub Agreement are governed by New Jersey law.

266.    Under New Jersey law, every contract has an implied covenant of good faith and fair dealing.

267.    Bhatia and Health have breached the covenant of good faith and fair dealing by their conduct, as aforesaid.

268.    As a direct and proximate result thereof, Plaintiffs have sustained substantial damages and will continue to suffer damages unless Bhatia and Health are enjoined and restrained.

46

**COUNT THIRTEEN**

**MISAPPROPRIATION, MISUSE AND CONVERSION OF PLAINTIFFS'
PROPRIETARY INFORMATION
(All Defendants)**

269.     Plaintiffs repeat the preceding paragraphs and incorporates them herein as if set forth at length.

270.     In the scope of Bhatia's employment with Vita-Pure and VNH, Bhatia was given, in confidence, access to and did access Plaintiffs' Proprietary Information.

271.      At all times Defendants were aware of the duty of loyalty owed by Bhatia to Vita-Pure, and thereafter to VNH, and his obligations under the Employment Agreement.

272.     By engaging in the conduct described above, Bhatia has disclosed, and Defendants have misappropriated, misused, and converted, Plaintiffs' valuable Proprietary Information for their own benefit in breach of, among other things, Plaintiffs' confidence, Bhatia's duty of loyalty, and the terms Employment Agreement.

273.      Defendants' conduct was intentional and malicious and has caused and will continue to cause irreparable injury to Plaintiffs unless Defendants are restrained for which Plaintiffs have no adequate remedy at law.

**COUNT FOURTEEN**

**TORTIOUS INTERFERENCE WITH CONTRACT AND WITH PROSPECTIVE
ECONOMIC ADVANTAGE
(All Defendants)**

274.     Plaintiffs repeat the preceding paragraphs and incorporates them herein as if set forth at length.

275.     Defendants knew that Plaintiffs have existing customers and ongoing

relationships with vendors, suppliers, service-providers, and third-party manufacturers that Plaintiffs have expended considerable time and money in developing.

276.    Defendants further knew that following the termination of Bhatia's employment, for any reason, Bhatia was prohibited from using Plaintiffs' Proprietary Information for his "personal gain" and from "compet[ing] directly or indirectly" with VNH for the period of three years.

277.    Defendants further knew that Bhatia's conduct, as aforesaid, was unlawful and violative of Plaintiffs' rights and entitlements.

278.    Notwithstanding Defendants' knowledge, as aforesaid, Bhatia, with the direct and indirect assistance of the remaining Defendants, tortiously interfered with Plaintiffs' contractual relations and prospective economic advantage by, *inter alia*, directly or indirectly (a) contacting, diverting, inducing, recruiting or soliciting Plaintiffs' employees and customers, whether potential or otherwise, (b) contacting, inducing, recruiting or soliciting Plaintiffs' vendors, suppliers, service-providers, and third-party manufacturers with whom Bhatia had dealings on behalf of Plaintiffs during his  employment with Vita-Pure and/or VNH and (c) disclosing Plaintiffs' Proprietary Information to third parties and/or using such information for Defendants' personal gain.

279.    Plaintiffs had a reasonable expectation of economic advantage from its customers and the relationships it had developed with employees, vendors, suppliers, service-providers, and third-party manufacturers.

280.    But for Defendants' tortious interference, Plaintiffs would have continued to receive an economic benefit from its existing relationships with its employees, customers, vendors, suppliers, service-providers, and third-party manufacturers, and potentially an economic

48

benefits from new customers and other third-parties based on its those existing relationships.

281.    Defendants' conduct, as aforesaid, was willful, wanton, malicious and/or in reckless disregard of Plaintiffs' rights.

282.    Defendants' actions as aforesaid, constitute, *inter alia*, tortious interference with contract and with prospective economic advantage, and are otherwise unlawful.

283.    As a direct and proximate result of Defendants' tortious interference with Plaintiffs' contractual relations and prospective economic advantage with its customers and other third-parties, as aforesaid, Plaintiffs have and will continue to sustain damages.

## COUNT FIFTEEN

### UNFAIR COMPETITION
### (All Defendants)

284.    Plaintiffs repeat the preceding paragraphs and incorporates them herein as if set forth at length.

285.    The actions of Defendants as aforesaid, constitute unfair competition and are otherwise unlawful.

286.    The aforesaid actions of Defendants were willful, wanton, malicious and/or in reckless disregard of Plaintiffs' rights.

287.    As a direct and proximate result of Sita's actions, Promedia has and will continue to sustain damages.

## COUNT SIXTEEN

### BREACHES OF THE DUTY OF LOYALTY
### (BHATIA)

288.    Plaintiffs repeat the preceding paragraphs and incorporates them herein as if set forth at length.

289.    At all times during his employment by Vita-Pure and thereafter by VNH, Bhatia had a duty of undivided loyalty to those employers that requires that he not act contrary to their interests.

290.    Bhatia's duty of loyalty included an obligation (a) not to compete with Plaintiffs; businesses; (b) not to steal property or Proprietary Information from Plaintiffs, (c) not to use Plaintiffs' Proprietary Information for his personal gain, and (d) not to destroy Plaintiffs' property.

291.    As set forth above, Bhatia breached his duty of loyalty during the course of his employment by Vita-Pure and VNH by, inter alia, using and converting Plaintiffs' Proprietary Information, establishing competitive business and operating the Competitive Websites in direct competition with Plaintiffs' businesses and the E-Commerce Sites, converting VNH's property, including but not limited to inventory items and the Stolen Computers, diverting Plaintiffs' customers, changing the registrant information for VitaNHerb.com from VNH to multiple entities controlled by Bhatia and ultimately to Jagambe, and submitting a trademark applications with the USPTO for "Pure Naturals" in his own name, and for "Nutri-Essentials" and "Vitamins Hub" in the name of HNB, and not that of VNH.

292.    As a further direct and proximate result of Bhatia's wrongdoing, Vita-Pure and VNH have sustained irreparable harm and damage and will continue to suffer irreparable harm and damage unless Bhatia is enjoined and restrained.

**COUNT SEVENTEEN**

**UNJUST ENRICHMENT**
**(ALL DEFENDANTS)**

293.     Plaintiffs repeat the preceding paragraphs and incorporates them herein as if set forth at length.

294.     By engaging in the conduct described above, including inter alia, breaching or conspiring to breach Bhatia's obligations and duties, and misappropriating the Plaintiffs' Proprietary Information,  diverting Plaintiffs' customers and customer payments, hijacking the E-Commerce Sites, and misrepresenting themselves as authorized to incur expenses on behalf of VNH and/or acting on behalf of VNH for the purposes of launching and operating Defendants' competitive businesses, Defendants have been unjustly enriched at the expense and substantial loss of Plaintiffs.

295.     Defendants should be required to disgorge all misappropriated funds and profits.

296.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs has been and will continue to be damaged.

**COUNT EIGHTEEN**

**ACCOUNTING**
**(ALL DEFENDANTS)**

297.     Plaintiffs repeat the preceding paragraphs and incorporates them herein as if set forth at length.

298.     As set forth above, Defendants diverted and have retained payments from Plaintiffs' customers that were processed by 3rd Party Processors.

299.     In addition, Defendants have diverted customers from Plaintiffs directly and indirectly, by hijacking the E-Commerce Sites and, upon information and belief, using Keywords

and other domain names that Bhatia caused VNH to purchase for the purpose of redirecting customers to the Competitive Websites and other search optimization methods.

300.    Plaintiff are unable to ascertain all monies Defendants siphoned from Plaintiffs through 3rd Party Processors and the monies received from customers diverted from Plaintiffs by Defendants.

301.    As a result, Plaintiffs are entitled to a full and accurate accounting of all monies received by Plaintiffs as a result of their tortious and illegal conduct.

## PRAYER FOR RELIEF AS TO ALL COUNTS

**WHEREFORE**, Plaintiffs demand judgment be entered granting the following relief:

A.    Temporarily, preliminarily and permanently enjoining and restraining Defendants, their subsidiaries, affiliates, divisions, officers, directors, principals, servants, employees, attorneys, representatives, successors and assigns, and all those in active concert or participation with them, from, directly or indirectly:

  a. Utilizing, changing, destroying, deleting, impairing or transferring the Stolen Computers and the information resident on the Stolen Computers and directing that within twenty-four hours of the Court's Order that Defendants return the Stolen Computers and information resident on those computers to Plaintiffs, by and through Plaintiffs' counsel Mandelbaum, Salsburg, Lazris, Discenza, PC;

  b. Disclosing and/or using for Defendants' personal gain or otherwise, Plaintiffs' confidential or Proprietary Information including, but not limited to, the content of e-mails directed to Plaintiffs, as well as any information derived from such confidential or Proprietary Information and e-mails.

  c. Using the trademarks "Vitamins Hub", "Nutri Essentials" and/or "Pure Naturals" in connection with the promotion, advertisement, display, sale, offering for sale, production, import, export, circulation or distribution of any product or service;

  d. Using any unauthorized colorable imitation of the trademarks "Vitamins Hub", "Nutri Essentials" and/or "Pure Naturals" in connection with the promotion,

advertisement, display, sale, offering for sale, production, import, export, circulation or distribution of any product or service;

e.  Engaging in any other activity constituting unfair competition with Plaintiffs, constituting an infringement of Plaintiffs' rights in and/or diluting the "Vitamins Hub", "Nutri Essentials" and/or "Pure Naturals" trademarks, and/or otherwise causing damage to Plaintiffs' reputation and goodwill;

f.  Purchasing keyword advertising and/or utilizing any links, metatags or code consisting of or identical and/or similar to the trademarks "Vitamins Hub", "Nutri Essentials" and/or "Pure Naturals" and/or for the purposes of diverting web-traffic from Plaintiffs' E-Commerce Sites;

g.  Purchasing keyword advertising and/or utilizing any links, metatags, domain names or code intended to divert customers from Plaintiffs' E-Commerce Sites;

h.  Soliciting, contacting, or communicating with any of Plaintiffs' suppliers, customers, vendors, or service providers and/or interfering with Plaintiffs' relationship with any such suppliers, customers, vendors, service providers, or prospective suppliers, customers, vendors, or service providers of Plaintiffs, for a period of time to be determined by the Court;

i.  Effecting any assignments or transfers, forming any new affiliates, entities or associations or utilizing any other person or device, for the purpose of evading or avoiding any injunction entered against them and/or transferring any of Plaintiffs' property including, but not limited to, Plaintiffs' monies, inventory, e-mails, Proprietary Information, trademark rights, and the Stolen Computers.

j.  Transferring, selling, encumbering, pledging, disposing of, or causing damage to, the domain names Vita-Pure.com VitaNHerbs.com, VitaminsHub.com, Nutri-Essentials.com, Nutri-Essentials.net, Nutri-Essentials.com, Nutri-Essentials.us, NutriEssentials.net, Amazing Ayuraveda.com and BeautyAura.com, and Clickstore.com or any of the websites operated at those addresses, and from terminating the operation of those websites, and further Ordering that a constructive trust be imposed on behalf of Plaintiffs with respect to such domain names and websites, until such time as the Court has determined who, as between Plaintiffs and Defendants, are entitled to own and/or use such domain names and the websites operated at those addresses;

k.  Transferring ,using, encumbering, pledging, disposing of, or dissipating all revenues previously derived through, and that may be derived prospectively through, the operation of any website located at Vita-Pure.com VitaNHerbs.com, VitaminsHub.com, Nutri-Essentials.com, Nutri-Essentials.net, Nutri-Essentials.com, Nutri-Essentials.us, NutriEssentials.net, Amazing Ayuraveda.com and BeautyAura.com, and imposing a constructive trust on such revenues until such time as the Court has determined who, as between Plaintiffs and Defendants,

are entitled to such revenues;

l.  Transferring, selling, encumbering, pledging, disposing of, or causing damage to, the Amazon webstores operated as VitaminsHub@Amazon, VitaminsHub-CA, Amazing Ayurveda, ClickStores, Amazing Nutritional, and GoodBrands, terminating the operation of those webstores, and further Ordering that a constructive trust be imposed on behalf of Plaintiffs with respect to webstores' names, webstores, any inventory held on behalf of those webstores and all revenues previously derived and that may be derived prospectively through the operation of those webstores, and restraining Defendants from transferring, using or dissipating all such revenues, until such time as the Court has determined who, as between Plaintiffs and Defendants, are entitled to operate those webstores, and to retain such inventory and revenues;

m.  Transferring, using, encumbering, pledging, dissipating or disposing of all revenues previously or prospectively derived though the Amazon Vendor Account operated by Defendants, and further Ordering that a constructive trust be imposed on such revenues until such time the Court determines who is entitled to same; and

n.  Accessing, intercepting, using, reviewing, copying and transmitting e-mails directed to Plaintiffs though the E-Mail System, including all attachments to such e-mails.

B.  Temporarily, preliminarily and permanently enjoining and restraining Bhatia, his agents, employees, representative, assigns, and all those in active concert or participation with him from, directly or indirectly, breaching and/or continuing to breach the Employment Agreement and Vitamins Hub Agreement.;

C.  Ordering that Defendants produce all of their computers for a forensic inspection, duplication and examination pursuant to a protocol to be established by the Court.

D.  Ordering that Defendants be required to file with this Court and serve on Plaintiffs within seven (7) days after the date of the Court's Order issuing temporary, injunctive relief requested by Plaintiffs, a Certification setting forth in detail the manner in, and extent to which, Defendants have complied with such injunction(s);

E.  Ordering Defendants to return to Plaintiffs immediately all of Plaintiffs'

54

confidential information, Proprietary Information and e-mails, and all documents that are derived from, or refer or relate to same;

F.      Ordering that all temporary restraints entered by the Court are thereafter preliminarily and permanently, extended for a period of time to be determined by the Court;

G.      Finding that Plaintiffs are the owners of, and/or entitled to all rights in, the domain names Vita-Pure.com VitaNHerbs.com, VitaminsHub.com, Nutri-Essentials.com, Nutri-Essentials.net, Nutri-Essentials.com, Nutri-Essentials.us, NutriEssentials.net, Amazing Ayuraveda.com and BeautyAura.com, and the websites operated at those addresses, and directing Defendants to transfer ownership, control and/or operation of same to Plaintiffs within five (5) days of this Court's Order, and to make all necessary and reasonable efforts to ensure that such domain names and the websites located at those addresses, and the reputation, goodwill and operations of such websites, are not damaged prior to or in the course of such transfer;

H.      Finding that Plaintiffs are the owners of, and/or entitled to all rights in, the webstores operated as VitaminsHub@Amazon, VitaminsHub-CA, Amazing Ayuraveda, ClickStores, Amazing Nutritional, and GoodBrands, and directing Defendants to transfer ownership, control and/or operations of same to Plaintiffs within five (5) days of this Court's Order and to make all necessary and reasonable efforts to ensure that the names, reputation, goodwill and operations of such webstores are not damaged prior to or in the course of such transfer;

I.      Requiring Defendants to account and to pay over to Plaintiffs all monies realized from their wrongful acts;

J.      Directing Defendants to disgorge and to pay to Plaintiffs all profits realized through the operation of the Competitive Sites;

K.     Awarding Plaintiffs treble damages pursuant to RICO;

L.     Awarding Plaintiffs statutory damages;

M.     Awarding Plaintiffs compensatory and punitive damages in an amount to be determined at trial;

N.     Awarding Plaintiffs all costs and fees, including reasonable attorneys' fees;

O.     Awarding Plaintiffs pre-judgment and post-judgment interest; and

P.     Awarding Plaintiffs such other and further relief as the Court deems just and equitable under the circumstances.

MANDELBAUM SALSBURG, P.C.
Attorneys for Plaintiff

By: _____
Lauren X. Topelsohn, Esq.

Dated: December 16, 2014

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure and Local Civil Rule 38.1, Plaintiffs hereby demands a trial by jury.

MANDELBAUM SALSBURG, P.C.
Attorneys for Plaintiff

By: _____
Lauren X. Topelsohn, Esq.

Dated: December 16, 2014

56

## CERTIFICATION PURSUANT TO R. 4:5-1

I certify that the matter in controversy is not subject to any other action or arbitration now pending nor is any other action or arbitration planned.   I hereby certify that no other parties should be joined in this action.

MANDELBAUM SALSBURG, P.C.
Attorneys for Plaintiff

By: _____
Lauren X. Topelsohn, Esq.

Dated:  December 16, 2014

## VERIFICATION

Achyut Sahasra, being of full age, certifies as follows:

I am the President of Vita-Pure, Inc., Delta Laboratories Inc., VNH, LLC, and Best Nutritionals, LLC, the plaintiffs in this action. I have read the foregoing Verified Complaint. Except for facts specifically alleged upon information and belief, I have personal knowledge of the facts set forth herein and I verify that they are true and correct to the best of my knowledge. I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

ACHYUT SAHASRA

Dated: December 16, 2014